Filed 12/26/23  In re J.J. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | H050955 (Santa Clara County Super. Ct. No. 22JD027147) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY & CHILDREN'S SERVICES, Plaintiff and Respondent, v. M.J., Defendant and Appellant. | |

Congress enacted the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) to protect the best interests of Indian children and to promote the stability of Indian tribes and families by establishing minimum standards for removal of Indian children and placement in foster or adoptive homes.  (25 U.S.C. § 1902.)  In turn, California enacted conforming legislation imposing on courts and county child welfare departments an "affirmative and continuing duty to inquire" whether a child involved in juvenile dependency proceeding "is or may be an Indian child."  (Welf. & Inst. Code, § 224.2, subd. (a).[1])  However, ICWA does not apply solely based on a child's or parent's Indian ancestry.  (*In re Ezequiel G.* (2022) 81 Cal. App. 5th 984, 1009 (*Ezequiel G.*).)

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

Instead, whether a child is an " 'Indian child' is based on the child's political affiliation with a federally recognized Indian Tribe." (Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38778, 38801 (June 14, 2016); see also *Ezequiel G.*, at p. 1009.) In particular, the term "Indian child" is defined to mean an unmarried individual under the age of 18 who is "(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also *id.*, § 1903(8) [defining "Indian tribe" to mean federally recognized groups and communities of Indians].)

In this case, M.J. (Mother), appeals from an order terminating her parental rights and freeing her child, J.J., for adoption. Her sole contention on appeal is that the Santa Clara County Department of Family and Children's Services (the Department) and the juvenile court failed to provide the formal notice under ICWA. (25 U.S.C. § 1901 et seq.) The Department, however, complied with its duty of inquiry under ICWA, which gave it reason to *believe* that J.J. is or may be an Indian child, but not reason to *know* that J.J. is or may be an Indian child, and thus did not trigger ICWA's formal notice provisions. We therefore affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Dependency Petition*

J.J. first came to the Department's attention in late February 2022, when Mother left J.J., then almost age two, in a running car in the middle of the night and an unknown suspect drove off with J.J. in the vehicle. Law enforcement located J.J. the following day. A search of Mother's recent law enforcement contacts revealed that Mother had left J.J. unattended in a vehicle in Oregon on at least three occasions: twice in October 2021 and once in January 2022.

Shortly thereafter, the Department filed a section 300 petition alleging that J.J. was at substantial risk of serious physical harm as a result of Mother's failure to adequately supervise. (§ 300, subd. (b)(1).) At the initial detention hearings, the juvenile court

2

sustained the petition, declared J.J. a dependent child of the court, and removed the minor from Mother's care.[2]

B. *The Department's Investigation*

At the initiation of the dependency proceedings, the Department made inquiries to Mother and several extended family members about possible Indian ancestry. Mother and J.J.'s maternal grandmother informed the Department that the family has Cherokee ancestry. A paternal cousin once removed informed the Department that her family had Cherokee and Blackfoot ancestry. Another paternal cousin once removed stated that she was unaware of any member of J.J.'s family having Indian ancestry, but her aunt (mother of the aforementioned paternal cousin) had some Indian ancestry, but she did not have any further information. However, all four denied knowledge of any family member being enrolled or eligible for enrollment in a tribe, residing on a reservation, or participating in tribal court proceedings.

The Department also made inquiries to a maternal aunt and five additional paternal relatives—a paternal uncle and his fiancée, a paternal great-uncle, a paternal second cousin, and the cousin of paternal step-grandmother—each of whom denied knowledge of any family member being enrolled in a tribe, residing on a reservation, participating in tribal court proceedings, or having Indian ancestry.

At the initial detention hearing, in light of the evidence that J.J. may have Indian ancestry, the court found reason to believe that J.J. is an Indian child and ordered further inquiry regarding ICWA. At the detention rehearing two weeks later, Mother informed the court that she believed she had Cherokee ancestry and that she did not have any further information, but that maternal grandmother or great-grandmother might have such information. Mother also reported that she had previously worked on a reservation but admitted that to her knowledge no one in her family had formally registered or enrolled

---

[2] J.J.'s father died before the dependency proceedings.

3

in a tribe or lived on a reservation. A paternal uncle and paternal first cousin reiterated their previous statements to the Department, informing the court they were unaware of any Indian ancestry on the paternal side of J.J.'s family, except for a paternal first cousin once removed that might have such ancestry. Following this voir dire, the court found that the ICWA did not apply to the proceedings concerning J.J.

In the days following the detention rehearing, the Department made further inquiries to the maternal grandmother and four paternal relatives: an aunt, a grandfather, a first cousin once removed, and the mother of a paternal half-sibling. The maternal grandmother "provided family ancestry information" and informed the Department that J.J.'s maternal great-grandmother and great-grandfather were deceased. The paternal aunt reported that her mother had 16 percent Indian ancestry according to an ancestry.com DNA test but denied knowledge of any family members being enrolled in a tribe, living on a reservation, or participating in tribal court proceedings. The remaining three paternal relatives denied any Indian ancestry. The Department unsuccessfully attempted to contact a maternal grandfather and an additional paternal relative.

In April 2022, the Department telephoned and emailed inquiries concerning J.J.'s membership or eligibility for membership to the Cherokee Nation, the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana, the United Keetoowah Band of Cherokee Indians, the Eastern Band of Cherokee Indian tribes, and the State Department of Social Services. The Department's emails provided J.J.'s first and last name, birthdate, and place of birth, and attached a family tree showing the names of various extended family members and the birthdates for J.J.'s parents and grandparents.

The Cherokee Nation responded that neither J.J. nor his parents were registered as tribal citizens and that J.J. was not an Indian child under ICWA.

The Department then sent inquiries, via certified mail, to the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana, the United Keetoowah Band of Cherokee Indians, and the Eastern Band of Cherokee Indians. The Department also sent informal

4

letters concerning tribal membership to the Eastern, Rocky Mountain, and Eastern Oklahoma Region offices of the Bureau of Indian Affairs (BIA), which together cover the Eastern Band of Cherokee Indians, the Blackfeet Tribe, the Cherokee Nation, and the United Keetoowah Band of Cherokee Indians.  In its April 22, 2022 addendum report to the juvenile court, the Department stated that it had inquired of all available participants about possible Indian heritage and concluded that there was reason to believe, but no reason to know, that J.J. is an Indian child.

The court held a disposition hearing on April 25, 2022.  On that same date Mother completed a Parental Notification of Indian Status form, checking the box to indicate that "[o]ne or more of [her] parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe," and named the Cherokee tribe.  When asked by the court, Mother clarified that she had checked the box because of the information from her maternal grandmother that she might have Cherokee ancestry, not because of new information.  The paternal grandmother also attended the disposition hearing and informed that court that she was unaware of any Indian ancestry in the family.  The court found at that time that ICWA did not apply and that there was no reason to believe that J.J. is an Indian child.

In June 2022, the Blackfeet Tribe responded to the Department's inquiry concerning J.J.'s membership or eligibility for membership in the tribe, stating that J.J. was not eligible for enrollment and was not domiciled on the Blackfeet Indian reservation.  In October 2022, the United Keetoowah Band of Cherokee Indians also informed the Department that J.J. was not eligible for enrollment in, and was not a recognized member of, the tribe.  That same month, the Department submitted an addendum to its six-month status review report, stating that J.J. was not an Indian child or ICWA eligible according to any of the four tribes identified, and recommending that the court terminate family reunification services and set a section 366.26 hearing to free J.J. for adoption.

5

A contested six-month review hearing was held in November 2022, at which time the court adopted the Department's recommendation to terminate family reunification services and set a section 366.26 selection and implementation hearing for March 2023.

In March 2023, the Department submitted its section 366.26 report, including a summary of its investigation. According to the report, in October and December 2022, two additional paternal family members (the paternal aunt/caregiver and another extended family member) informed the Department that they were not aware of any family members having Indian ancestry, being enrolled in a tribe, living on a reservation, or participating in tribal court proceedings. The Department also reported that in December 2022 and February 2023 it had contacted Mother and numerous previously contacted extended family members to inquire whether they had any new or updated information regarding Indian ancestry. In December 2022, Mother informed the Department that she "had a percentage" of Indian ancestry from her mother's side but could not provide additional information other than that it "was a minimal bloodline." The extended family members, including the maternal grandmother, grandfather, aunt, uncle, and great-grandmother, and paternal uncle, great-uncle, great-aunt, grandmother, grandfather, and several paternal first and second cousins, each denied having Indian ancestry, affirmatively stated that J.J. was not an Indian child, and/or were unable to provide additional information beyond that previously reported to the Department.

During the section 366.26 hearing on March 15, 2023, the Department again made ICWA inquiries of Mother, J.J.'s paternal aunt/caregiver, and J.J.'s great-aunt. Mother reiterated that the maternal grandmother had told her previously that she had Cherokee or Blackfoot heritage, but that she did not have any additional information. J.J.'s paternal aunt/caregiver and his great-aunt both asserted that they did not believe their families had Indian heritage. The court found that there had been a diligent inquiry, that there was no reason to know that J.J. is an Indian child, and that ICWA did not apply. The court terminated Mother's parental rights and ordered adoption as the permanent plan for J.J.

6

Mother timely appealed the juvenile court's order.

## II. DISCUSSION

On appeal, Mother contends that the juvenile court's order terminating parental rights must be reversed and the matter remanded to the juvenile court because the court failed to ensure compliance with ICWA's noticing requirements. She argues the court's findings that ICWA did not apply are not supported by substantial evidence because the Department failed to send formal ICWA notices to the Indian tribes and BIA. We conclude that the Department satisfied its duties under ICWA.

A. *Standard of Review*

"We review the juvenile court's ICWA findings for substantial evidence. [Citation.] Where the facts are undisputed, we independently review whether ICWA's requirements have been satisfied. [Citation.]" (*In re I.F.* (2022) 77 Cal.App.5th 152, 162-163; see also *In re A.M.* (2020) 47 Cal.App.5th 303, 314 (*A.M.*).)

B. *The Duties to Investigate and to Provide Notice*

Under California law implementing ICWA (§§ 224.2, subds. (a)-(e), 224.3), courts and county welfare departments (as well as probation departments where applicable) have three distinct duties in dependency proceedings: (1) a duty to inquire whether the child may be an Indian child; (2) a duty of *further inquiry* if that first inquiry creates a "reason to *believe*" the child is an Indian child; and (3) a duty to *provide formal notice* if that further inquiry results in a reason to *know* the child is an Indian child. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

First, in all cases, courts and county welfare departments have an "affirmative and continuing duty to inquire" whether a child is or "may be" an Indian child. (§ 224.2, subd. (a).) This duty begins "with the initial contact" with the party reporting child abuse and continues once a child is placed in the county welfare department's temporary custody. (*Id.*, subds. (a), (b).) This initial inquiry requirement "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family

7

members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (*Id*., subd. (b).)

Second, if there is "reason to believe that an Indian child is involved in a proceeding," a duty of further inquiry arises. (§ 224.2, subd. (e).) This duty of further inquiry includes (1) interviewing parents and extended family members to gather certain information, (2) contacting the BIA and State Department of Social Services for assistance in identifying the tribes in which the child might be a member or be eligible for membership, and (3) "[c]ontacting the tribe or tribes and any other person [who] may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (*Id.*, subd. (e)(1)-(3); see also *Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 999.) Contact with a tribe at a minimum must include "telephone, facsimile, or electronic mail contact to each tribe's designated agent" and "information identified by the tribe as necessary for the tribe to make a membership or eligibility determination." (§ 224.2, subd. (e)(2)(C).)

Third, when a court or social worker "knows or has reason to know" that a child is an Indian child, a duty arises to provide notice to, among others, the child's tribe. (§ 224.3, subd. (a); see *A.M.*, *supra*, 47 Cal.App.5th at p. 315; *Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 999.) "There is 'reason to know' a child is an Indian child if any one of six statutory criteria is met—i.e., if the court is advised that the child 'is an Indian child,' the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (*Ezequiel G.*, at p. 999, citing § 224.2, subd. (d).)

If this duty to provide notice is triggered, the child's apparent tribe must be given notice sufficient to enable a tribe to meaningfully review its records to determine whether a child is an Indian child. (*In re D.F.* (2020) 55 Cal.App.5th 558, 568 (*D.F.*).) Such

8

notice must include a wide range of information, including " '[i]f known, the names, birthdates, birthplaces, and Tribal enrollment information" of parents and "other direct lineal ancestors of the child, such as grandparents.' " (*A.M.*, *supra*, 47 Cal.App.5th at p. 317, quoting 25 C.F.R. § 23.111(d)(3) (2019); see § 224.3, subd. (a)(5)(C).) Failure to provide such notice requires the appellate court to vacate and remand for further proceedings consistent with ICWA. (*A.M.*, at p. 317.) However, "[i]f the juvenile court finds that 'proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child,' the court may make a finding that ICWA does not apply to the proceedings, 'subject to reversal based on sufficiency of the evidence.' " (*Ezequiel G.*, *supra* at p. 999, quoting § 224.2, subd. (i)(2).)

C. *The Department's Performance of Its Duties*

Mother does not dispute that the Department satisfied its initial and further duties to inquire whether J.J. is or may be an Indian child. The initial duty of inquiry arose when J.J. was removed from his mother's care, and the Department satisfied that duty by asking Mother and numerous other members of J.J.'s extended family whether J.J. is an Indian child. The Department also satisfied its duty of further inquiry. That duty arose when the Department learned that J.J. might have Indian ancestry and there was reason to believe J.J. is an Indian child. The Department satisfied this duty by interviewing Mother and extended family members, contacting the regional BIA offices and the State Department of Social Services, and contacting, via telephone, email, and/or certified mail, each of the four identified tribes regarding J.J.'s membership and eligibility for membership in those tribes.

Mother argues that a duty to provide notice arose, which the Department failed to satisfy. We disagree. While the information obtained in the course of the Department's inquiries *suggested* that J.J. may have Cherokee or Blackfeet ancestry, it did not provide

9

reason to *know* that J.J. is a member or eligible to become a member of a federally recognized Indian tribe.

As noted at the beginning of this opinion, the ICWA does not define "Indian child" in terms of race or ancestry. Instead, the ICWA defines "Indian child" based on political affiliation: " 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also *id.*, § 1903(8) [defining "Indian tribe" to mean groups or communities "recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians"].) Although Indian ancestry is often associated with membership or eligibility for membership in a federally recognized Indian tribe, "Indian ancestry . . . is not among the statutory criteria for determining whether there is a reason to know a child is an Indian child." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 887.) Indeed, " 'many racially Indian children' do not fall within ICWA's definition of an Indian child, while others may be Indian children even though they are 'without Indian blood.' [Citation.]" (*Id.* at p. 889.) Consequently, "Indian ancestry, without more, does not provide a reason to believe that a child is a member of a tribe or is the biological child of a member" and therefore does not trigger the duty to provide formal notice to the child's tribe. (*Ibid.*; see also *A.M.*, *supra*, 47 Cal.App.5th at pp. 321-323 [statements and "family lore" indicating Indian heritage require further inquiry but not notice].)

Because the information uncovered by the Department's further inquiry showed only possible Indian ancestry, and there was no evidence of membership or eligibility for membership in a federally recognized tribe, no duty to give formal ICWA notice under section 224.3 arose. As a consequence, we need not consider whether the ICWA notices sent to the tribes in this case complied with section 224.3. (See *D.F.*, *supra*, 55 Cal.App.5th at p. 570-571.)

10

### III. DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

_____
BROMBERG, J.

WE CONCUR:


_____
GROVER, ACTING P.J.




_____
LIE, J.




*In re J.J.; Santa Clara County DFCS v. M.J.*
H050955